1
2
3
4
5                     IN THE UNITED STATES DISTRICT COURT

6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    EDGARDO M. RUIZ,                    )      No. C 02-4636 JSW (PR)
                                         )
9                    Petitioner,         )
                                         )
10         vs.                           )      **ORDER DENYING PETITION**
                                         )      **FOR WRIT OF HABEAS CORPUS**
11   MIKE KNOWLES, Warden,               )
                                         )
12                   Respondent.         )
     _____)
13

14

15                            **INTRODUCTION**

16         Petitioner, a prisoner of the State of California incarcerated at Mule Creek State

17   Prison, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  For the

18   reasons stated below, the petition is denied on the merits.

19                      **PROCEDURAL BACKGROUND**

20         On September 25, 1998, a jury convicted Petitioner of murder with a street gang

21   enhancement.  The jury found that Petitioner committed the murder in the course of a

22   robbery and with the use of a firearm (Count One).  Petitioner was also convicted of

23   robbery and attempted robbery (Counts Two and Three), as to which allegations of street

24   gang enhancements and firearm use were found true.

25         On December 18, 1998, Petitioner was sentenced to life without the possibility of

26   parole for the murder, enhanced by four years for the firearm use.  Prison terms were

27   imposed and stayed on Counts Two and Three.

28         The California Court of Appeal affirmed Petitioner's conviction and sentence in

1  an unpublished opinion filed October 24, 2000.  The California Supreme Court denied

2  the petition for review on January 30, 2001.

3          On April 5, 2001, Petitioner filed a petition for writ of habeas corpus in the Santa

4  Clara County Superior Court, which denied the petition on May 15, 2001.  Petitioner

5  filed a renewed petition in the Superior Court, which denied the renewed petition on July

6  23, 2001.  *See* Answer, Ex. 9.  Petitioner unsuccessfully filed for habeas relief in the

7  California Court of Appeal and the California Supreme Court, which denied relief on

8  August 21, 2002.  *Id.*, Ex. 11.

9          On September 25, 2002, Petitioner timely filed the instant petition for writ of

10  habeas corpus.  On March 24, 2003, the Court ordered Respondent to show cause why a

11  writ should not issue.  On June 13, 2003, Respondent filed an answer and supporting

12  documents (docket no. 10).  On September 4, 2003, Petitioner filed a traverse (docket no.

13  19).

14                          **FACTUAL BACKGROUND**

15          The facts underlying the commitment offenses are summarized as follows:[1]

16          These offenses occurred from July 1995 to October 1995 as part of a crime
    spree by the Barrio Grande Terra (BGT) gang, a Norteno gang which included
17  [co-defendant Joseph Ryan] Hayes, Ruiz and Angel Sierra among its members.

18          Angel Sierra pleaded guilty to the second degree murder of Joshua
    Hernandez, a number of robberies and a drive-by shooting, and to a street gang
19  enhancement.  He is currently serving a sentence of 15 years to life in prison in
    out-of-state confinement.  Sierra, who the jury was advised was an accomplice as
20  a matter of law, testified in return for his plea and sentence.  Ruiz confessed to the
    attempted murder of David Browne (count three) and the robbery and murder of
21  Joshua Hernandez (counts one and two).  Although Ruiz did not testify at trial, his
    redacted confession was admitted.

22  Oct. 24, 2000 Slip Op. at 2.

23  *//*

24

25  ─────────────────────

26      [1]      The facts in this section are derived from the opinion of the Court of Appeal
    of the State of California, Sixth Appellate District, affirming the judgment of the Superior
27  Court.  *See* Answer, Ex. 6 (Oct. 24, 2000 Slip Op.).

28                                          2

A.   The July 28, 1995 Murder/Robbery

On July 28, 1995, Joshua Hernandez, Heath Liles, and David Browne went to a San Jose bar, and on the way they stopped at an ATM where they each withdrew some cash. At about 1:30 a.m., Browne and Hernandez began walking back from the bar to Browne's apartment at 633 South Eighth Street in San Jose. Liles, who had left the bar alone to go buy beer, testified that he believed both Hernandez and Browne still had cash when they left the bar.

According to Browne, as they were walking back from the bar, they noticed two young Hispanic males who were wearing beanie hats. As Browne and Hernandez reached the foot of the stairs to Browne's apartment, Browne heard what sounded like two voices demanding money.

When Browne and Hernandez turned around, Browne saw two men, each holding guns in their right hands, and each pointing the guns inches from Browne and Hernandez's heads. With his left hand, Browne struck at the wrist the extended gun arm of the person in front of him. Browne used his right hand to strike this person's right elbow, and then Browne pushed the gunman. Browne believed this person's gun went off after Browne struck the person's wrist. Immediately afterward, Browne also heard the other gunman's revolver fire. The gunmen then fled. Browne had not given them any money and he did not know if Hernandez had done so.

After the gunman left, Browne saw that Hernandez was on the ground and that he had been shot in the head. Browne called the police, and when they arrived, Browne realized he had also been shot.

Eddie Wu, who lived nearby, testified that he heard someone in the alley say "where is my money?" Afterwards, he heard two or maybe three gunshots. Wu looked out the window and saw someone using a cell phone and a man on the ground.

Hernandez died from the gunshot wound to the head. The size of the wound was consistent with a .22 caliber bullet. Officers examining the crime scene found no secondary bullet strikes or bullet casings. Casings would be ejected from a semiautomatic but not a revolver. The absence of casings could be because the casing was lodged in the shooter's clothing, stuck to the foot of arriving emergency personnel, or jammed in the gun. There were athletic shoe footprints in the dirt by Hernandez's body. Hernandez was found with a pager, ATM card, and identification but no cash.

*Id.* at 2-4.

B.   Petitioner's Statement to Police

In September 1995, police received an anonymous tip that Ruiz was involved in Hernandez's murder. Officer Donald Moore went to visit Ruiz in juvenile hall on October 3, 1995.

While interviewing Ruiz, Moore asked Ruiz where he had been the night of July 28, 1995. Ruiz stated that he knew exactly where he had been. Moore

3

asked Ruiz if Browne would select him from a photo lineup.  In response, Ruiz stated "What's in it for me?"  Moore then gave Ruiz the *Miranda* warnings and took an untaped statement.  The jury was admonished that the statement could only be considered against Ruiz, and not Hayes.

Ruiz stated that he shot Hernandez and said he did not mean to.  Ruiz started crying.  He said that he had gone to the Santa Clara County Fair, then had gone downtown with Angel Sierra.  They saw Browne and Hernandez and talked about robbing them.  Although initially reluctant to participate, Ruiz ultimately agreed.  Ruiz had a .22 revolver and Sierra had a .380 automatic.  After following the victims into the alley, Sierra yelled "Stay there" and "Give me your money" or "Give me your shit."  Sierra grabbed Browne and both Sierra and Ruiz had their guns drawn.  Hernandez handed Ruiz $17.  According to Ruiz, Browne and Sierra were wrestling over Sierra's gun.  Ruiz put his gun in his left hand and tried to pull Sierra away from Browne.  When Ruiz did this, Sierra's gun went off, striking Browne.  Browne then struck Ruiz's left hand and Ruiz's gun went off and struck Hernandez in the head.  Only two shots were fired.  After fleeing the scene, Ruiz saw that Sierra's gun had jammed and the bullet casing was stuck in the gun's ejection port.

Ruiz said he was a member of the BGT gang.

Ruiz was arrested that night and he showed Moore Sierra's residence.  Moore reinterviewed Ruiz that night, and obtained a taped statement redacted and played for the jury.  This statement was essentially the same as the first statement as to the robbery and murder of Hernandez.

Ruiz also supplied additional information.  He said that Sierra called him a punk and tried to embarrass him into participating in the Hernandez robbery and murder.  He also briefly mentioned a 7-11 robbery and the use of masks.  He said that the .380 semiautomatic was later taken from Sierra at gunpoint.

On October 4, 1995, police searched Sierra's apartment.  A search of the closet revealed Nike shoes with a sole design similar to that left at the murder scene.  Also found were a case for a handgun, .380 caliber ammunition in a box, a ring stolen in a different robbery, some marijuana, and a letter written to Sierra.  Ruiz's thumbprint was on the ammunition box.

Gun expert Edward Peterson said the bullet recovered from Hernandez's brain was likely from a .22 long rifle but could have been a .22 short.  Peterson stated that Browne's shirt hole was not made by a .22 or .25 bullet and probably not a .32 either.  He stated it could have been made by a .380 bullet or a .38.

*Id.* at 4-5.

C.    Testimony of Sierra

Sierra pleaded guilty to lesser crimes in return for testifying truthfully at trial, getting a lower sentence, and receiving out of state housing.  The jury was instructed that Sierra was an accomplice to all of the crimes as a matter of law.

In his testimony, Sierra confirmed Hayes's leadership of the BGT gang,

4

and Ruiz's membership.  According to Sierra, Hayes was usually the driver during the crimes.

Regarding the robbery and murder of Hernandez, Sierra testified that on the night of July 28, 1995, he went to the Tower of Power concert at the County Fair.  He saw Hayes, Ruiz, Ruiz's girlfriend and Hayes' mother and her husband. Sierra left with Hayes and Ruiz.  After dropping off his half-brother at his home, Hayes brought two guns wrapped in black beanies to the vehicle.  Hayes drove and the trio cruised around.  They saw Browne and Hernandez in the street and spoke of robbing them.  Hayes said he was the driver so Sierra and Ruiz should do it.  Ruiz did not want to go but Hayes repeated that he was the driver.  Hayes did not threaten Ruiz.  Rather, Hayes, as leader of the BGT, asked Sierra and Ruiz to commit the robbery and they agreed.

Hayes took out the guns and Sierra took the .380 semiautomatic and Ruiz took the .22 revolver.  Sierra said that the .380 was his but that Hayes sometimes retained it.  Sierra identified the pistol case found in his closet as the .380 case and said he kept ammunition in the case.

After taking the guns, Ruiz and Sierra ran up to the victims and demanded their money at gunpoint.  Browne reached for Sierra's gun, which was cocked. The gun fired but the shell stuck inside.  Ruiz tried to stop Browne by pulling Sierra away.  Ruiz's gun fired and Sierra and Ruiz fled.

The two ran to the truck, and Sierra threw the stuck bullet casing out the window.  They told Hayes what happened.  Ruiz said he had obtained some money, though not very much, and they divided it up three ways.  They all agreed not to speak about the crimes, and to say that they were at the concert.

When he was dropped off at home, Sierra took both guns and the beanies. A few days later, Hayes took back the .22 revolver and the beanies.

*Id.* at 7-8.

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 413 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Id.* As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) (citing *Williams*, 529 U.S. at 405-07), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

*LaJoie v. Thompson,* 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, there is a somewhat different standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  *See Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert,* 288 F.3d 1081, 1088 (9th Cir. 2002); *Bailey v. Newland,* 263 F.3d 1022, 1028 (9th Cir. 2001); *Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir. 2000).  If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law.  *See Lockhart v. Terhune,* 250 F.3d 1223, 1230 (9th Cir. 2001).

## DISCUSSION

### I.      DENIAL OF PETITIONER'S MOTION TO SEVER

In Claim One, Petitioner contends that the trial court erred in denying his motion to sever his case from that of codefendant Hayes.  Petitioner argues that redactions to his confession intended to protect Hayes' rights impinged upon Petitioner's right to present a defense.  This claim does not merit federal habeas relief.

#### A.      Legal Standard

A federal court may only grant a writ of habeas corpus where the trial court's failure to sever separate counts "results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane,* 474 U.S. 438, 446 n.8 (1986) (applying harmless error analysis to misjoinder of defendants).  *See also Grisby v. Blodgett,* 130 F.3d 365, 370 (9th Cir. 1997).  "There is no prejudicial constitutional violation unless 'the simultaneous trial of more than one offense ... actually render[ed] Petitioner's state trial fundamentally unfair and hence, violative of due process.'" *Sandoval v. Calderon,* 241 F.3d 765, 772 (9th Cir. 2000) (*quoting Featherstone v.*

1   *Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991)), *cert. denied*, 534 U.S. 943 (2001).  "This

2   prejudice is shown if the impermissible joinder had a substantial and injurious effect or

3   influence in determining the jury's verdict."  *Id.*  Factors that may be considered in

4   determining whether joinder is unduly prejudicial include the joinder of other crimes

5   where the evidence would otherwise be inadmissible and the joinder of a 'weak'

6   evidentiary case with a 'strong' one.  *See id.*

7       **B.     Analysis**

8       This Court looks to the analysis of the Court of Appeal in evaluating Petitioner's

9   claim.  *LaJoie*, 217 F.3d at 669 n.7.

10      Portions of Petitioner's confession to the police were redacted for trial in order to

11  protect his codefendant, Hayes.  Petitioner argues that his redacted statement, as

12  presented to the jury, harmed him in two ways: (1) he was precluded from presenting a

13  defense of duress because some of the content of his confession was excluded, such as

14  the facts that Hayes and Sierra were initially going to commit the robbery, that Hayes

15  embarrassed Petitioner and made him go in Hayes' place, and that Hayes provided the

16  gun; and (2) the redaction diminished Petitioner's ability to show mitigating

17  circumstances in an effort to obtain jury nullification on the special circumstance

18  allegation.[2]  (Pet., 19-20.)

19      The California Court of Appeal considered and rejected both arguments, finding

20  that Petitioner was not prejudiced by the redaction:

21          Ruiz contends that the unredacted confession shows that Hayes and Sierra
        called Ruiz a punk and tried to embarrass him into robbing Hernandez and
22      Browne.  Not only does such peer pressure by fellow gang members fall far short
        of the kind of threat of immediate harm and demand to commit the crime that is
23      necessary to constitute duress, most of this evidence actually was in the redacted
        version.  The redacted version shows that Ruiz stated that he had been called a
24      "punk."  Moreover, Officer Moore testified that Ruiz stated, in his first untaped
        statement, that he was reluctant to commit the robberies.  Ruiz points to nothing in
25

26      [2]     Petitioner's jury nullification argument is further discussed in Section V.
27  *See infra* p. 23.

28                                              8

his unredacted statement reflecting that either Sierra or Hayes threatened him with immediate bodily harm if Ruiz did not commit the crimes.

Ruiz also claims the unredacted version showed that Hayes gave him the gun while the redacted version deleted that fact, and therefore he claims the redacted confession made it appear as if he were the source of the gun.  However, Sierra expressly testified that Hayes was the source of the gun, and this was a fact that the prosecutor conceded.

Ruiz also claims a separate trial would have allowed him to testify because he would not have been intimidated by the fact that Hayes was present, and would not have been afraid that Hayes, as the gang leader, might seek retribution if Ruiz chose to testify.  The fact is, however, Ruiz could have testified but chose not to.  Moreover, Hayes already knew that Ruiz had confessed so Ruiz's status as an individual who refused to talk and who chose to protect the gang was hardly unblemished.  Ruiz's claim that he could have presented other witnesses or evidence had he had a separate trial is too speculative to be meritorious.  In short, all of Ruiz's contentions either fail to show how the redactions could have prejudiced him, or fail to adequately demonstrate why evidence he claims he was deprived of was not available to him in spite of the fact that the confession was admitted.

(Oct. 24, 2000 Slip Op. at 16-17.)

Here, Petitioner has not shown that joinder of defendants resulted in a substantial and injurious effect or influence in determining the jury's verdict.  Petitioner cites to excluded portions of his confession indicating that Hayes gave him the gun used in the crime.  (Pet., 20 and n.18 (citing 9 Clerk's Tr. 2569)).  However, there was no contradicting evidence suggesting that Petitioner owned the gun.  Trial counsel argued in closing that Petitioner "had no real power or say in the gang.  There is no evidence that he ever had possession or control over the gun except for the night in question, or he could take that gun home or that he kept in any place or he would take it with him.  It wasn't his gun.  He didn't have that kind of position in the gang." (21 Rep. Tr. 4355)

The Court of Appeal concluded that Petitioner was able to assert a duress defense and argue mitigating circumstances as well as he would have if the unredacted confession had been admitted into evidence.  Even the prosecutor acknowledged that Petitioner took part in the crime because he was sent by Hayes as one of his soldiers. *See* 20 RT 4239.  Petitioner has not demonstrated that he was prejudiced by the joinder.  The

9

1    state courts' determination is neither contrary to, nor an unreasonable application of,

2    clearly established federal law.  This claim is therefore denied.

3    **II.    REFERENCES TO EXCLUDED EVIDENCE**

4         In Claim Two, Petitioner contends that the prosecutor committed misconduct by

5    eliciting statements from Sergeant Moore that an anonymous caller claimed to have

6    overheard Petitioner bragging about a homicide and that Petitioner was on probation

7    when the charged crimes occurred.  Prior to Moore's testimony, the trial court had

8    ordered exclusion of evidence of the anonymous caller and of Petitioner's probation.

9    Petitioner does not demonstrate that Moore's testimony created prejudicial error, and this

10   claim does not warrant federal habeas relief.

11        **A.    <u>Legal Standard</u>**

12        A defendant's due process rights are violated when a prosecutor's misconduct

13   renders a trial "fundamentally unfair."  *See Darden v. Wainwright*, 477 U.S. 168, 181

14   (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process

15   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

16   culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's

17   remarks were improper and, if so, whether they infected the trial with unfairness.  *Tan v.*

18   *Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is

19   decided "'on the merits, examining the entire proceedings to determine whether the

20   prosecutor's remarks so infected the trial with unfairness as to make the resulting

21   conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.)

22   (citation omitted), *cert. denied*, 516 U.S. 1017 (1995).  To prevail on a claim for habeas

23   relief based on trial error, the petitioner must establish that it resulted in "actual

24   prejudice," that is, that the error "had substantial and injurious effect or influence in

25   determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)

26   (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

27

28                                              10

The first factor in determining the prejudicial effects of misconduct is whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge); *Tan*, 413 F.3d at 1115 ("we presume jurors follow the court's instructions absent extraordinary circumstances").  This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant.  *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury received instructions five different times to consider only the evidence presented, and not its sympathy for the victim's life story).

Other factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.

//

11

**B.**   <u>Analysis</u>

In the absence of a reasoned explanation of the decision by a state court addressing Petitioner's prosecutorial misconduct claim, the Court must conduct an independent review of the record to ascertain whether the state court denial of this claim was objectively unreasonable. *Himes*, 336 F.3d at 853.

Petitioner challenges Sergeant Moore's testimony about an anonymous phone call identifying Petitioner "as bragging about a homicide." (10 Rep. Tr. 1583-84.) The trial judge sustained trial counsel's objection and instructed the jury as to the limited use of that hearsay testimony to explain Moore's conduct thereafter. (10 Rep. Tr. 1584.) The trial court took curative action and the error cannot be said to have so infected the trial with unfairness as to deny Petitioner due process. *See Darden*, 477 U.S. at 182.

Furthermore, the Court finds harmless any error in eliciting Moore's testimony that "I knew at one time that [Lee Chavez] had been Mr. Ruiz's probation officer." (10 Rep. Tr. 1586.) Trial counsel's objection to the reference to Petitioner's probation officer was sustained, and the testimony was stricken from the record. (10 Rep. Tr. 1586-87.) Trial counsel argued in closing that Petitioner was an "unsophisticated teenager" and that there was "no evidence of a prior or extensive juvenile record and no evidence of other crimes that he participated in." (21 Rep. Tr. 4354.) Petitioner does not show that any further testimony of his probation was elicited at trial. In light of the limited scope of the erroneous testimony, the trial court's curative action in striking the testimony, defense counsel's closing argument denying any evidence of prior record, and the eyewitness testimony and confession providing strong evidence of guilt, the error in Moore's testimony did not have substantial and injurious effect or influence on the outcome of the trial, and was therefore harmless.

The state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority. This claim is

1    therefore denied.

2    **III.    DENIAL OF MOTIONS**

3         In Claim Three, Petitioner challenges the trial court's denial of his motion for a

4    mistrial and denial of his request for an admissibility hearing pursuant to section 402 of

5    the California Evidence Code.  Petitioner claims that the denial of the Section 402

6    hearing denied him the right to cross-examine a government witness.  This claim does

7    not merit federal habeas relief.

8         **A.    Legal Standard**

9         The admission of evidence is not subject to federal habeas review unless a

10   specific constitutional guarantee is violated or the error is of such magnitude that the

11   result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v.*

12   *Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th

13   Cir.), *cert. denied*, 479 U.S. 839 (1986).  In order to obtain federal habeas relief on the

14   basis of an evidentiary error, a petitioner must show that the error was one of

15   constitutional dimension and that it resulted in "actual prejudice."  *Brecht v.*

16   *Abrahamson*, 507 U.S. 619 (1993).  A habeas petitioner is not entitled to relief unless the

17   record demonstrates that the trial error "had substantial and injurious effect or influence

18   in determining the jury's verdict." *Id.* (*quoting Kotteakos v. United States*, 328 U.S. 750,

19   776 (1946)).

20        The Confrontation Clause of the Sixth Amendment provides that in criminal cases

21   the accused has the right to "be confronted with witnesses against him."  U.S. Const.

22   amend. VI.  The federal confrontation right applies to the states through the Fourteenth

23   Amendment.  *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).  For purposes of federal

24   habeas corpus review, the standard applicable to violations of the Confrontation Clause

25   is whether the inadmissible evidence had an actual and prejudicial effect upon the jury.

26   *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir.) (citing *Brecht*, 507 U.S. at 637

27

28                                                    13

1  (1993)), *cert. denied*, 537 U.S. 851 (2002).

2       The Confrontation Clause guarantees an opportunity for effective cross

3  examination, not cross examination that is effective in whatever way, and to whatever

4  extent, the defense might wish.  *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per

5  curiam).   The Confrontation Clause does not prevent a trial judge from imposing

6  reasonable limits on cross-examination based on concerns of harassment, prejudice,

7  confusion of issues, witness safety or interrogation that is repetitive or only marginally

8  relevant.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  To determine whether

9  a criminal defendant's Sixth Amendment right of confrontation has been violated by the

10  exclusion of evidence on cross-examination, a court must inquire whether: "(1) the

11  evidence was relevant; (2) there were other legitimate interests outweighing the

12  defendant's interests in presenting the evidence; and (3) the exclusion of evidence left

13  the jury with sufficient information to assess the credibility of the witness."  *United*

14  *States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted), *cert. denied*,

15  530 U.S. 1277 (2000).  *See Bright v. Shimoda*, 819 F.2d 227, 229-30 (9th Cir. 1987) (no

16  constitutional violation where substantial cross examination permitted and excluded

17  evidence was of collateral nature), *cert. denied*, 485 U.S. 970 (1988).

18       **B.**    **Analysis**

19       The last reasoned state court opinion on the denial of Petitioner's motion for

20  mistrial is that of the Santa Clara County Superior Court on state habeas review.  This

21  Court therefore looks to that court's analysis in evaluating Petitioner's claim.  *LaJoie*,

22  217 F.3d at 669 n.7.  The Superior Court addressed the trial error claims as follows:

23          Regarding Petitioner's other claims dealing with misconduct of the trial
    judge, Petitioner again fails to show prejudice.  Petitioner argues that the denial of

24      his mistrial motion, based on the fact that evidence was admitted showing that
    Petitioner was on probation, was improper and caused "great prejudice" to his

25      case.  However, Petitioner does not show how, in light of his admitted confession
    and the eyewitness testimony, the admission of his probation status prejudiced his

26      case.  Regarding the denial of his 402 hearing, Petitioner has not even shown how
    a conversation between Officer Moore and his Probation Officer Chavez is

27

28

relevant to his case.  Without establishing relevance, prejudice cannot be discussed.

Answer, Ex. 9 (July 23, 2001 Slip Op. at 13.)

Petitioner challenges the trial court's denial of his motion for mistrial upon Sergeant Moore's testimony about the anonymous caller's tip that Petitioner bragged about a homicide and about Petitioner's probation officer.  As discussed in Section II.B in the context of Petitioner's prosecutorial misconduct claim, *supra*, those trial errors were harmless and did not cause actual prejudice.

Petitioner also challenges the trial court's denial of a hearing pursuant to California Evidence Code section 402, out of the jury's presence, about the contents of Moore's conversation with Probation Officer Chavez.  (Pet., 40-43.)  Upon requesting the Section 402 hearing, defense counsel argued that she needed to determine whether Moore and Chavez's conversation was an appropriate area for cross-examination, particularly in light of Moore's testimony that they used to work together "in the gang unit."  *See* 10 Rep. Tr. 1586.  Defense counsel argued that she had no information as to the content of Moore's conversation with Chavez after Moore had testified to it, and wanted to ask Moore three or four questions about that conversation.  (11 Rep. Tr. 1601.)  Defense counsel argued that the content of the conversation was relevant in order for her to make a tactical decision as to whether to cross-examine Moore and to cure the testimony that Petitioner had been on probation.  *Id.* at 1601-03.

The trial court denied the Section 402 hearing and held that "whatever Sergeant Moore told probation officer Chavez is not relevant to this case, and that motion is denied."  *Id.* at 1603.  Petitioner contends that he was denied the opportunity to cross-examine Moore as to his prejudicial testimony about the Petitioner's probation and comment about gangs.  Petitioner has not shown, however, how his proposed cross-examination would have supported his defense or otherwise had a substantial effect or influence on the outcome of the trial.

15

Considering the extent that Petitioner was permitted to cross-examine Moore at trial to enable the jury to assess the witness's credibility, and the tangential nature of the proposed cross-examination, the trial court did not violate Petitioner's right to cross-examine Moore by denying the Section 402 hearing. *See Bright v. Shimoda*, 819 F.2d at 229-30. Even assuming that the trial court erred in denying the Section 402 hearing, any such error was harmless. The trial court found that Moore's comment about Petitioner's probation officer was not prejudicial: "Probation officer Chavez testified here in court that he was present. He's known to the jury as a probation officer." (11 Rep. Tr. 1601.) Furthermore, the trial court struck Moore's comment about Petitioner's probation officer from the record. (10 Rep. Tr. 1586-87.)

Similarly, any error in limiting cross-examination as to Moore's comment about Officer Chavez's work in the gang unit is harmless and inconsequential in light of witness testimony and Petitioner's own admission about his involvement with the BGT gang.

The state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority. This claim is therefore denied.

## IV.   MIRANDA CHALLENGE

In Claim Four, Petitioner contends that Sergeant Moore failed to inform him that he had a right to have an attorney present during his October 3, 1995 statement at juvenile hall and his tape-recorded statement taken later that day at the police station following his arrest, in violation of the Fifth Amendment under *Miranda v. Arizona*, 384 U.S. 436 (1966). This claim does not merit federal habeas relief.

### A.   <u>Legal Standard</u>

*Miranda* warnings must be clear and not susceptible to equivocation. *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2002). They must provide

16

1  "meaningful advice to the unlettered and unlearned in language which they can

2  comprehend and on which they can knowingly act." *Id.* (internal quotation marks and

3  brackets omitted); *see, e.g., id.* at 387-89 (holding that *Miranda* warnings were

4  confusing and thus inadequate when they followed administrative warnings that

5  informed the suspect he did not have the right to government-appointed counsel).

6  Although "language difficulties may impair the ability of a person in custody to waive

7  these rights in a free and aware manner," *United States v. Heredia-Fernandez*, 756 F.2d

8  1412, 1415 (9th Cir.), *cert. denied*, 474 U.S. 836 (1985), a court must consider the

9  totality of the circumstances to determine whether there has been a voluntary waiver.

10  *United States v. Bernard S.*, 795 F.2d 749, 751-52 (9th Cir., 1986).  A defendant's

11  voluntary waiver of *Miranda* rights can be established, despite his limited English

12  proficiency, where "the evidence seems to indicate that he understood his rights and

13  voluntarily, knowingly and intelligently waived them." *Id.* at 752.

14      **B.**    <u>**Analysis**</u>

15      The last reasoned state court opinion on Petitioner's *Miranda* challenge is that of

16  the Santa Clara County Superior Court on state habeas review.  This Court therefore

17  looks to that court's analysis in evaluating Petitioner's claim. *LaJoie*, 217 F.3d at 669

18  n.7.  Evidence of whether Petitioner received adequate *Miranda* warnings and whether

19  he voluntarily waived those rights was litigated pretrial at a suppression hearing on

20  August 11, 1998.  *See* Answer, Ex. 2, 5 Rep. Tr. 223-67.  The Superior Court

21  summarized the relevant evidence as follows:

22          Petitioner's confessions were obtained in the following manner.  Officer
   Donald Moore received an anonymous phone tip that Petitioner was involved in a
23  street robbery that ended in the murder of one victim and the wounding of another
   on July 29, 1995.  On October 3, 1995, at around 10 A.M., Officer Moore went to
24  juvenile hall to speak with Petitioner who was being held there on unrelated
   criminal activity.  Officer Moore approached Petitioner and asked where he was
25  on the date in question.  Officer Moore then asked if one of the victims could pick
   Petitioner out in a photo line up.  In response, Petitioner asked what was "in it" for
26  him if he talked to Officer Moore.  At this point, Officer Moore fully Mirandized
   Petitioner.  Petitioner stated that he was willing to talk.  Officer Moore took notes

27

28          17

of his subsequent interview with Petitioner, and, at the end, had Petitioner review his notes and sign off on them.  Petitioner confessed to his involvement in the street robbery and claimed that, during a struggle, his gun went off accidentally, killing one of the victims.

Later that same day, at approximately 7 P.M. Petitioner was released from juvenile hall, and was immediately met by Officer Moore and Sargent [sic] Zarate who arrested Petitioner and took him to the police station for an interview. According to Officer Moore, during the trip to the station house, Petitioner repeatedly expressed a desire to make statements regarding his involvement in the robbery and shootings, but Officer Moore told Petitioner to wait until they reached the station house.

The second interview at the station house was tape recorded.  At the start of the interview, Officer Moore reminded Petitioner that he gave a statement earlier that day and that the statement was given voluntarily after Officer Moore informed him of his *Miranda* rights.   Officer Moore did not issue fresh *Miranda* warnings specifically for this second interview.  Petitioner statements during this second interview were essentially the same as the statement made earlier that day.

(July 23, 2001 Slip Op. at 3-4.)

### 1.    Petitioner's First, Unrecorded Statement

Petitioner argues that even if Sergeant Moore read the *Miranda* warnings as he claimed, reading from a card in a single sequence without stopping (5 Rep. Tr. 239-240), Petitioner did not understand the *Miranda* warnings as indicated by the later recorded statement showing that he failed to understand other, shorter statements.  (Pet., 51.) Moore acknowledged at the suppression hearing that Petitioner was seventeen years old at the time of the interview and spoke with a Puerto Rican accent, though not a heavy accent.  *Id.* at 240. Moore further testified that he needed to repeat some questions that Petitioner didn't understand and wanted to have clarified, but that language was not the problem. *Id.*

The Superior Court rejected Petitioner's claim that he was not Mirandized before giving his first statement to Moore.  *See* Pet., 50-52.  The Superior Court found that "Petitioner submits a transcript of his subsequent tape-recorded interview in which he repeatedly acknowledges to Officer Moore that Petitioner received *Miranda* warnings earlier in the morning." *Id.* at 5 (citing Clerk's Tr. 2724A-2725.)  The evidence indicates that, despite his accent, Petitioner understood his rights and voluntarily, knowingly and intelligently waived them.  *See Bernard S.*, 795 F.2d at 752 (substantial evidence

18

supported finding that seventeen year-old with limited English proficiency understood and validly waived his *Miranda* rights).

### 2.  Petitioner's Second, Tape-Recorded Statement

Petitioner also claims that at the second interview later that day, Moore failed to warn Petitioner of his rights to the presence of an attorney during the interview and the appointment of an attorney if he could not afford one.  Moore testified that at the police station, he asked Petitioner "if he remembered me reading the rights to him, and I even mentioned a couple of the rights in referring to my notes.  I asked him if he remembered me telling him he had the right to remain silent, anything you say can be used against you in a court of law, and he said yes, he remembered that."  (5 Rep. Tr. 231.)  Petitioner argues that Moore failed to give him the complete *Miranda* warning.

The Superior Court rejected Petitioner's argument that this second interview, conducted about nine hours after the first statement, was conducted in violation of his *Miranda* rights, holding under state law that the issuance of the *Miranda* warnings at the earlier interview were sufficient to allow intelligent waiver at the subsequent interview. (July 23, 2001 Slip Op. at 5.)  The Superior Court held that the subsequent interview was "reasonably contemporaneous" with the first, that both interviews were conducted by the same officer, that Moore reminded Petitioner of his prior waiver, and that Petitioner was apparently familiar with the criminal process given that he was being held at juvenile hall on an unrelated crime at the time of the first statement.  *Id.* at 6.

This evidence indicates that Petitioner voluntarily, knowingly and intelligently waived his *Miranda* rights upon giving the second statement.  *See Bernard S.*, 795 F.2d at 752.  The nine-hour lapse of time between Petitioner's interviews did not render the earlier *Miranda* warnings ineffective.  "A rewarning is not required simply because there is a break in questioning."  *Guam v. Dela Pena*, 72 F.3d 767, 769 (9th Cir. 1995) (new *Miranda* warnings not required upon resumption of questioning fifteen hours after *Miranda* warnings were given when defendant was not in custody) (citing *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995)).   The state courts' rejection of this

19

claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority.  This claim is therefore denied.

## V.   JURY INSTRUCTION

Petitioner claims that his rights were violated by the trial court's use of the model jury instruction CALJIC No. 17.41.1, which provides:

> The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.

(14 Clerk's Tr. 3646.)

Petitioner claims that CALJIC No. 17.41.1 interfered with his Sixth Amendment right to trial by jury and his Fourteenth Amendment right to due process, in that it violated his right to a unanimous verdict; "chilled" the jury's deliberations; and infringed his right to jury nullification.  This claim does not merit federal habeas relief.

### A.   Legal Standard

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten,* 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'") (citation omitted).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.), *cert. denied*, 488

1    U.S. 861 (1988).

2          The Ninth Circuit has held that "no Supreme Court case establishes that an

3    instruction such as CALJIC No. 17.41.1 violates an existing constitutional right."

4    *Brewer v. Hall,* 378 F.3d 952, 955-56 (9th Cir.), *cert. denied*, 125 S.Ct. 814 (2004).[3]

5          **B.    Analysis**

6          This Court looks to the analysis of the California Court of Appeal in evaluating

7    Petitioner's claim.  *LaJoie*, 217 F.3d at 669 n.7.  That court rejected Petitioner's

8    arguments that CALJIC No. 17.41.1 either implicated his right to a unanimous verdict,

9    chilled free discussion during jury deliberations, or interfered with the jurors' power of

10   nullification.  *See* Oct. 24, 2000 Slip Op. at 17-21.

11         Petitioner argues that the instruction violates his right to a unanimous verdict by

12   inviting majority jurors to exercise undue pressure on minority jurors against dissenting,

13   in that the instruction allows the majority of jurors who may be frustrated with a

14   dissenting juror to report him or her to the court for misconduct.  Criminal defendants in

15   state court have no federal constitutional right to a unanimous jury verdict.  *Apodaca v.*

16   *Oregon*, 406 U.S. 404, 410-12 (1972) (rejecting 6th Amendment right to jury trial

17   challenge to 10-2 state jury verdict).  However, as California guarantees a unanimous

18   verdict under the state constitution, an instruction which interferes with that right could

19   conceivably raise a ground cognizable in federal habeas corpus if the instruction

20   rendered the trial as a whole so unfair as to violate the Fourteenth Amendment.  *See*

21   *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  However, petitioner's

22   argument is without merit.  The instruction only authorizes the jury to report a juror who

23

24         [3]      The Ninth Circuit also noted that the California Supreme Court has not
25   found that CALJIC 17.41.1 violated any established federal constitutional right, but,
     using its supervisory authority over the lower state courts, has discontinued use of the
26   instruction because of its "potential" to intrude on jury deliberations.  *Brewer*, 378 F.3d at
27   957 (citing *People v. Engelman*, 28 Cal. 4th 436 (2002)).

28                                                    21

is refusing to deliberate or to follow the instructions, not a juror who is simply dissenting from the majority.  If the jurors were to report a juror to the court for dissenting, the jury would not be following the jury instruction as written, as they are presumed to do.  *See Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997).  Because the instruction does not authorize a jury to report, or a court to admonish or remove, a juror on the basis of dissent, it cannot be said to interfere with the unanimity of a jury verdict.

Petitioner also argues that the instruction impedes the jury's free and open exchange of ideas because it authorizes reporting a juror for refusing to deliberate or follow instructions.  The rights to a jury trial and to due process require that jury deliberations remain private and protected from intrusive inquiry.  *Tanner v. United States*, 483 U.S. 107, 127 (1987).  Under this principle, there may be no inquiry into the subjective reasoning or mental processes of jurors.  *Id.* at 121; *United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999).  In evaluating whether an ailing instruction is unconstitutional, the court inquires whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *See Estelle v. McGuire*, 502 U.S. at 72 & n.4.

There is not a reasonable likelihood that this instruction would cause jurors to report the internal mental processes or subjective reasoning of a juror.  The instruction merely authorizes the jurors to report either a juror's refusal to deliberate, which is their conduct and not their mental reasoning, or their expressed intention not to follow instructions or to disregard the law, which is also not their internal subjective reasoning.  Moreover, the instruction does not authorize reporting of every word or idea exchanged by the jury, only those which violate the instructions or the law.  As such, the instruction helps the proper functioning of the jury by enabling the trial court to investigate jury misconduct if necessary.  There is not a reasonable likelihood that CALJIC No. 17.41.1 interfered with the private exchange of ideas among the jurors during deliberations.

1     As for Petitioner's juror nullification argument, juror nullification is not a right

2     under the Constitution, laws or treaties of the United States. *Brewer*, 378 F.3d at 956

3     ("[n]or has the Supreme Court found a constitutional violation in removing jurors who

4     are unwilling or unable to follow the trial court's instructions") (citing *Morgan v.*

5     *Illinois*, 504 U.S. 719, 730 (1992)). Jury nullification refers to the power of jurors to

6     ignore the law or facts and acquit a defendant. Although jurors have the power to engage

7     in nullification, they do not have a right to do so. *Merced v. McGrath*, 426 F.3d 1076,

8     2005 WL 2649443 at *2 (9th Cir., Oct. 18, 2005). Indeed, nullification is contrary to the

9     duty of jurors to take the law from the court and apply that law to the facts as they find

10    them to be. *Id.* The courts do not have a duty to ensure the free exercise of this power.

11    *Id.* Although courts have no means to undo nullification after the verdict of acquittal has

12    been made, they have the duty to forestall or prevent such conduct by firm instruction,

13    admonition or "where it does not interfere with guaranteed rights or the need to protect

14    the secrecy of jury deliberations, . . . by dismissal of an offending juror from the venire

15    or the jury." *Id.* (quoting *United States v. Thomas*, 116 F.3d 606, 616 (9th Cir. 1997)).

16    Any instruction that arguably impeded this non-existent right did not violate the

17    Constitution, laws or treaties of the United States, so the purported violation cannot

18    support habeas relief.

19        Even if the instruction were erroneous, the error in this case was harmless under

20    the *Brecht* standard. The California Court of Appeal noted that "Appellant cites no

21    evidence suggesting that the instruction had an untoward effect on any juror, impaired

22    the jury deliberations, or had any effect on the jury's verdict. In this regard, the record

23    does not disclose that the jury was ever deadlocked or that there were holdout jurors or

24    that a juror was accused of refusing to deliberate or follow. Thus, there is no basis to

25    support a finding that the instruction was prejudicial." (Oct. 24, 2000 Slip Op. at 20-21.)

26    The Court of Appeal thus held that any error in giving the instruction did not result in

27

28                                              23

actual prejudice. *Id.* The state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority. *See Brewer,* 378 F.3d at 955-56. This claim is therefore denied.

## VI. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

### A. <u>Legal Standard</u>

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391- 405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). In order to prevail on an ineffective assistance of appellate counsel claim, therefore, it must be established that counsel's performance was deficient, see *Strickland*, 466 U.S. at 687-88, and that there is a reasonable probability that, but for appellate counsel's unprofessional errors, the appeal would have prevailed. *Miller*, 882 F.2d at 1434 & n.9 (citing *Strickland*, 466 U.S. at 688, 694).

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a criminal defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882 F.2d at 1434 n.10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See Miller*, 882 F.2d at 1434. Consequently, appellate counsel ordinarily meets an objective standard of competence and causes his client no prejudice where he declines to raise a weak issue. *See id.*

### B. <u>Analysis</u>

The last reasoned state court opinion on Petitioner's ineffective assistance of appellate counsel claim is that of the Santa Clara County Superior Court. This Court therefore looks to that court's analysis in evaluating Petitioner's claim. *LaJoie*, 217 F.3d

at 669 n.7.

Petitioner claims that appellate counsel failed to raise on appeal the issues in his habeas petition, namely, the prosecutorial misconduct challenges in Claim Two, the judicial error challenges in Claim Three, and the *Miranda* challenge in Claim Four.  The Superior Court held that Petitioner failed to demonstrate prejudice as to any of his claims.  (July 23, 2001 Slip Op. at 14-15.)   Here, even assuming that appellate counsel's performance was deficient for failing to raise these claims on appeal, Petitioner has not demonstrated a reasonable probability that any of those claims would have prevailed on appeal.   The state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority. *See Brewer,* 378 F.3d at 955-56.  This claim is therefore denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  November 10, 2005

JEFFREY S. WHITE
United States District Judge